**FRIENDS OF THE WILD SWAN, INC., Alliance for the Wild Rockies Inc., Ecology Center, Inc., American Wildlands, Inc., Montana Environmental Information Center Inc., Plaintiffs,**

v.

**U.S. ENVIRONMENTAL PROTECTION AGENCY, Carol Browner, Administrator, Jack McGraw, Region VIII EPA Administrator, Defendants,**

and

**State of Montana, ex rel. Department of Environmental Quality, Montana Wood Products Association, Montana Stockgrowers Association, and Montana Farm Bureau Federation, Intervenors.**

**No. CV 97–35–M–DWM.**

United States District Court,
D. Montana,
Missoula Division.

June 21, 2000.

Jack R. Tuholske, Missoula, MT, Jory Ruggiero, Bozeman, MT, for Friends of Wild Swan, Alliance for Wild rockies, Ecology Center, Inc., American Wildlands.

Claudia L. Massman, Montana Dept. of Environmental Quality, Helena, MT, Jack R. Tuholske, Missoula, MT, Jory Ruggiero, Bozeman, MT, for Montana Environmental Information Center, Inc.

Deanne L. Sandholm, Office Of The U.S. Attorney, Helena, MT, Daniel R. Dertke, U.S. Department Of Justice, Environmental Defense Section, Washington, DC, Margaret J. Livingston, Associate Regional Counsel, U.S. Environmental Protection Agency, Denver, CO, for U.S. E.P.A., Carol M. Browner, Jack Region, VIII.

John F. North, Claudia L. Massman, Montana Dept. of Environmental Quality,

Helena, MT, Jane Amdahl, Dept. of Environmental Quality, Helena, MT, for State of Montana, ex rel. Dept. of Environmental Quality.

Rebecca W. Watson, Jeffrey M. Hindoien, Gough Shananhan Johnson & Waterman, Helena, MT, for Montana Wood Products Ass'n, Montana Stockgrowers Ass'n, Montana Farm Bureau Federation.

### ORDER

MOLLOY, District Judge.

*Procedural Background*

On November 4, 1999, the Court granted Defendants summary judgment on Counts I and III and part of Count II of the complaint, claims brought under a provision of the Clean Water Act, 33 U.S.C. § 1313. The Court granted Plaintiff summary judgment on part of Count II of the Complaint, alleging violations of the Administrative Procedures Act under 5 U.S.C. § 706. I found that the EPA acted arbitrarily and capriciously in failing to disapprove Montana's submission of 130 total maximum daily loads (TMDLs) out of the 900 water quality limited segments (WQLSs) the State had identified by 1998. *See* 5 U.S.C. § 706(2)(A).

The question now involves determining the proper remedy for the EPA's violation.

*Factual and Legal Background*

The EPA's liability is grounded on the Clean Water Act. Specifically, 33 U.S.C. § 1313 requires the Administrator to review states' formulations of ambient water quality standards for their own waterbodies. *Id.* § 1313(a)–(c). Each state has the responsibility in the first instance to identify waterbodies that are compromised despite permit-based limits on point-source pollutant discharges. The waters so identified are commonly called " 'water quality limited' segments," or WQLSs. The state must then prioritize among its WQLSs, based on the severity of the pollution and the beneficial uses of each waterbody. *Id.* § 1313(d)(1)(A). Once a WQLS is identified, the state must formulate a total maximum daily load (TMDL) for the WQLS. *Id.* § 1313(d)(1)(C). The TMDL represents the WQLS's capacity, with a margin for error, to tolerate point source, nonpoint source, and natural background pollution while still meeting or exceeding the ambient water quality standards. *Id.*

Once the state has formulated a TMDL for a WQLS, the EPA must review both the ambient water quality standards, to ensure they meet or exceed federal standards, and the TMDL for each WQLS, to ensure that the state knows how to maintain or achieve its approved water quality standards. If the EPA finds a deficiency in these submissions, it then has an affirmative duty to identify WQLSs and to develop appropriate TMDLs. 33 U.S.C. § 1313(d)(2).

Unless a court finds that a state has made a constructive submission of zero WQLSs, the EPA does not have an affirmative duty to identify WQLSs. However, the EPA does have an affirmative duty to review water quality standards and TMDLs and to remedy deficiencies. *See* 33 U.S.C. § 1313(d)(2). My Order of November 4, 1999, held that the EPA violated this duty by accepting Montana's development of 1 TMDL after the 1996 listing of WQLSs and 130 TMDLs after the 1998 listing. In effect, the Court held that the EPA's approval of Montana's submission of 130 TMDLs for 900 WQLSs was arbitrary and capricious because the imperatives of the Clean Water Act demand quick development of TMDLs. *See* Order of November 4, 1999, at 22–23.

The State of Montana has set a goal of developing TMDLs for each of the roughly 900 WQLSs on its 1996 list by May 5, 2007. *See* Mont.Code Ann. § 75–5–703(3) (1999).

*Plaintiff's Proposal: Special Master to Determine Priority and Oversee TMDL Development*

Plaintiff proposes the appointment of a special master to monitor a schedule for TMDL development on a watershed basis

at a rate of approximately 15% of the identified WQLSs per year, for a deadline completion date of December 31, 2007. Under this proposal, the Court would retain jurisdiction of the matter, through the Special Master, until the requisite TMDLs are completed. Plaintiff's proposal also provides for semi-annual reports to the Special Master and to the Plaintiff. Plaintiff points out that this plan is consistent with court-ordered TMDL implementation schedules in other jurisdictions as well as consent decrees entered into by the EPA in other jurisdictions. Plaintiff also suggests that the EPA and/or State of Montana should compensate the Special Master or that a United States Magistrate Judge be appointed under Fed.R.Civ.P. 53(f).

■ The cases Plaintiff cites in support of its proposed remedy are distinguishable from the present situation. In both *Idaho Sportsmen's Coalition v. Browner*, 951 F.Supp. 962 (W.D.Wash.1996), and *Sierra Club v. Hankinson*, 939 F.Supp. 865 (N.D.Ga.1996), the EPA was held to have violated the Clean Water Act. By contrast, here the EPA violated the Administrative Procedures Act. The usual remedy in such circumstances is remand to the agency for further findings or further explanation of its findings. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 524–25, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *see also James City County v. EPA*, 955 F.2d 254, 260–61 (4th Cir.1992), *cited in* EPA Brief at 5. Other instances Plaintiff cites involve the EPA's consent to particular schedules.

Given the deference owed to the EPA's discretion and expertise, requiring TMDLs to be developed on a watershed basis, setting a pace of 15% of the total 1996 WQLSs per year for completion of TMDLs, and appointing a Special Master who would have the last word as to WQLS priorities is too intrusive. The idea could invite more disputes than it prevents. If such disputes arose, the entire process of court review slowed because, as Plaintiff

proposes, such disputes would first be handled by the Special Master.

*Defendants' Proposal: Remand to EPA for Further Agency Action*

Defendants recommend remand to the EPA for further action. The EPA argues that it might reasonably decide, on remand, that the number of TMDLs Montana submitted was reasonable in light of the state's current funding and resources for TMDL development. Montana argues that the EPA has not had the opportunity to review the state's failure to submit more than 130 TMDLs and that the agency must be given that opportunity before further judicial action is appropriate.

The argument for remand for further findings is undermined by Defendants' continued insistence that the EPA is not required to consider the pace at which TMDLs are submitted. *See* Associations' Brief at 2–6; Montana Brief at 3–4; EPA Motion for Reconsideration, *passim*. On the contrary, the Clean Water Act requires the EPA to consider pace. The role of the EPA is to ensure that Congress' law and policy objectives are carried out. The EPA reviews each state's identification of WQLSs and each state's submission of TMDLs for its WQLSs. A state's submission of few WQLSs is subject to EPA disapproval in the face of "hundreds [of] manifestly exist[ing]" threatened and degraded waters. *See Idaho Sportsmen's Coalition*, 951 F.Supp. at 964. Similarly, when TMDLs are not adequate to maintain ambient water quality standards, the EPA must disapprove them and reformulate the TMDL. *See* 33 U.S.C. § 1313(d)(2). Most tellingly, the Clean Water Act features short deadlines (*see id.* § 1313 *passim*). A TMDL must be developed quickly if it is to be useful in "implement[ing] the applicable water quality standards." *Id.* § 1313(d)(1)(C); *see also* Proposed Revisions to the Water Quality Planning and Management Regulation, 64 Fed.Reg. 46,012, 46,027 (1999) (codified at 40 C.F.R. pt. 130), *cited in* Associations'

Brief at Ex. A. This fact is acknowledged and recognized by the EPA.

The Defendants' argument would create an escape hatch in the heart of the Act whereby both the State and the federal agency could frustrate Congressional imperatives simply by refraining from action. I do not believe I am overstepping my authority and duty when I construe the Act to foreclose such abdication of responsibility. Such a determination comports with the intent of Congress.

The State further suggests that its development of 130 TMDLs might be found adequate if the EPA is permitted to consider the issue:

> For example, the EPA would need to consider such factors as the time necessary to develop TMDLs of varying complexity depending upon the source of impairment and the nature and degree of impairment.... EPA would also need to consider such factors as the amount of funding and resources the State Legislature has provided for TMDL development in Montana, the possibility of the State developing multiple TMDLs on a watershed basis, the time necessary to follow State requirements for local involvement in the development of TMDLs, and the appropriate amount of public participation required for each TMDL.

Montana Brief at 5; *see also* EPA Brief at 5–6; Associations' Brief at 6–7.

I agree that these factors are important. They do not, however, address the central problem in this case. Montana did not list any WQLSs, much less develop any TMDLs, between June 26, 1979, and 1992. The EPA did not seek to enforce the mandatory deadlines set in the Clean Water Act during those thirteen years. As a result, pollutant discharges into Montana's waters have not been properly assessed, controlled, or monitored. There is no way to assess the damage caused by this delay.

Now, however, the Montana State Legislature has also mandated that TMDLs be developed for each of the sites on Montana's 1996 list of WQLSs by May 5, 2007. The State has failed to meet such deadlines in the past. Yet, in proposing a remedy for the violation in this case, only the EPA suggests that it should impose a deadline for the development of the requisite TMDLs.

*The Court's Remedy*

■ To Montana's list of factors for the EPA to consider, the Court's remedy adds only one: all necessary TMDLs for each of the 900 WQLSs on Montana's 1996 list must be completed by May 5, 2007. This remedy does not intrude upon either the State's or the agency's realm of discretionary decision making. In fact, the Court reaffirms the State's discretion by imposing on the EPA the deadline set by state statute. This deadline is more stringent than the ten-year deadline proposed by the EPA,[1] but it is less stringent than the command of the Clean Water Act.[2] Because the Court's remedy does not require use of a Special Master, the State retains its full measure of discretion to prioritize the 1996 WQLSs, and the EPA retains its discretion to approve or disapprove Montana's submission of TMDLs. Indeed, under the proposed remedy, the EPA might still approve Montana's submission of 130 TMDLs in 1998. It would have to do that, however, in view of the total number of TMDLs that must be completed by May 5, 2007.

Additionally, to facilitate review of the pace of TMDL development, the Court will require that the EPA and the State of Montana jointly develop a schedule that will result in the completion of all TMDLs required for the 1996 WQLSs by May 5, 2007. The schedule will be finalized by November 1, 2000. The State has already expended significant time and resources in

---

1. To establish a ten-year deadline would put the Court in the position of ordering a violation of Montana law.

2. Were it not too late to follow all the mandates of the Act, the EPA would have to develop the requisite TMDLs within thirty days. *See* 33 U.S.C. § 1313(d)(2).

laying the foundation for TMDL development in Montana. *See* Montana Brief at 9–10. Setting the schedule will constitute a final agency action, reviewable on appeal, without the Court's retention of jurisdiction in the present matter. Failure to meet the scheduled milestones will give Plaintiff or other organizations with standing an opportunity to challenge the agency's actions in this Court. Development of a schedule will give the EPA and the State the opportunity to gather and assess the facts underlying the schedule—e.g., where watershed TMDLs might or might not be appropriate, what funding will be necessary, which WQLSs should be evaluated first, how complex each WQLS is and what factors must be evaluated in the development of its TMDLs, and so forth. Finally, the public will have an opportunity to comment on the agency's proposed schedule, with the exception, of course, of the ultimate deadline.

Accordingly, IT IS HEREBY ORDERED that:

1. By May 5, 2007, the United States Environmental Protection Agency shall approve or establish TMDLs for all WQLSs identified on Montana's 1996 list submitted under § 303(d) of the Clean Water Act.

2. The EPA, working in conjunction with the State of Montana, shall develop and adopt a schedule which will result in the development of all necessary TMDLs for each of the sites on Montana's 1996 list by May 5, 2007. Development of the he schedule shall comply with all the procedures pertinent to a final agency action, including but not limited to appropriate periods for public comment. Development of the schedule shall be completed by November 1, 2000, and shall constitute a final agency action.

3. The TMDLs approved or established by the EPA shall comply with all statutory and regulatory requirements of § 303(d) of the Clean Water Act and of 40 C.F.R. part 130.

The TMDLs approved or established by the EPA shall be approved or established in accordance with all the procedures pertinent to a final agency action, including but not limited to public comment.

4. In accordance with 33 U.S.C. § 1313(d)(1)(C), the State of Montana shall be given the opportunity to prioritize among the sites on the 1996 list and to develop TMDLs for EPA approval. Within thirty (30) days of Montana's submission of any TMDL, the EPA shall approve or disapprove the TMDL. If the EPA disapproves a TMDL, it shall establish an appropriate TMDL within thirty (30) days of its disapproval.

5. The EPA's failure to meet any milestone of the established schedule shall constitute a final agency action.

6. Until all necessary TMDLs are established for a particular WQLS, the EPA shall not issue any new permits or increase permitted discharge for any permittee under the National Pollutant Discharge Elimination System permitting program.

7. This case is REMANDED to the Environmental Protection Agency for further proceedings consistent with this Opinion and Order. The clerk shall enter judgment by separate paper in accordance with this opinion and order.